UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ADAM A. LOCKE,

           Plaintiff,

         v.                            Case No. 18-C-443

RICHARD SCHMIDT, et al.,

           Defendants.

## DECISION AND ORDER

Plaintiff Adam A. Locke, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983, alleging that his civil rights were violated while he was a pretrial detainee and in custody of the Milwaukee County Jail. While in custody, Locke alleges that his cell's extreme heat and clogged ventilation caused him physical harm. This matter comes before the court on Defendants' motion for summary judgment. For the reasons that follow, Defendants' motion for summary judgment will be granted and the case will be dismissed.

## BACKGROUND

From January 23, 2018 to August 21, 2018, Locke was housed at the Milwaukee County Jail (Jail) as an inmate with the United States Marshals Service. Def.'s Proposed Findings of Fact (DPFF), ¶ 2, Dkt. No. 29. Defendant Richard Schmidt was the interim Milwaukee County Sherriff. *Id.* at ¶ 4. The other Defendants performed work at or were employed by the Jail: Defendant Aaron Dobson as Administrator-Commander of the Jail; Defendant Daniel Dittberner as Assistant Commander of the Jail; Defendant Catherine Trimboli as Patrol Division Commander; Defendant Joel Neumann as team leader of the Inmate Worker Program in the Jail;

and Defendant Steven Turner as an employee of the Special Projects department for the Jail. *Id.* at ¶¶ 4–7, 18, 30–32.

On January 23, 2018, the day Locke was booked into the Jail, he was given a patient health assessment. *Id.* at ¶¶ 52–53. Because his initial health assessment showed high blood pressure, Locke was given daily blood pressure checks for one week. *Id.* at ¶ 55. Initially, Locke was housed in Pod 3C, cell 45. *Id.* at ¶ 52. The medical records do not reveal any complaint by Locke regarding his cell conditions during this week. *Id.* at ¶ 56. On January 31, 2018, Locke told Brandon Decker that stress issues caused him high blood pressure. *Id.* at ¶ 57. The medical records from this day do not show that he complained about his cell conditions. *Id.* at ¶ 60. On February 6, 2018, a nurse took Locke's blood pressure; no note was made in the medical record regarding his cell conditions. *Id.* at ¶ 61.

Workers from Honeywell regularly performed smoke detector alarm checks in the Jail, typically once per month. *Id.* at ¶ 62. While a fire alarm check is being conducted, inmates are escorted from their cells to the gym. *Id.* at ¶ 63. On February 21, 2018, during one of these fire alarm checks, Locke complained to Neumann that his cell was too hot while Neumann escorted Locke to the gym for the fire alarm check. *Id.* at ¶¶ 63, 65. Neumann informed Turner of Locke's complaint about his cell. *Id.* at ¶ 68. Turner then contacted facilities to place a work order. *Id.* Neumann and Turner did not receive any complaints from other inmates on February 21, 2018, about the heat in the pod that housed Locke. *Id.* at ¶ 69. Some inmates requested that the temperature not be decreased to avoid making it too cold. *Id.* at ¶ 70. Facilities checked the system and determined that the temperature in Locke's cell may have increased due to the fire alarm test. *Id.* at ¶ 72. During the fire alarm test, the ventilation system is temporarily shut down as a safety precaution. *Id.* at ¶ 64.

Locke submitted a written grievance to the Jail about his cell conditions on February 25, 2018. *Id.* at ¶ 73; Dkt. No. 51-1 at 27. Locke alleged that hazardous levels of heat were being pumped into his cell by the ventilation system and the air intake vent was not functioning. Pl.'s Proposed Finding of Fact (PPFF), ¶ 32, Dkt. No. 50. He alleges that the temperature in his cell reached 90 degrees on this day. *Id.* A pod officer informed Locke on the day he submitted his grievance that Special Projects had been made aware of the situation. DPFF, ¶ 73. Locke claims that he did not receive a response to his grievance on February 25, 2018. PPFF, ¶ 32. On the inmate grievance form dated February 25, 2018, Locke checked "Yes" before two questions: "Have you tried to solve this problem by speaking with an Officer" and "Officer Attempted to resolve problem?". Dkt. No. 51-1 at 3.

On March 4, 2018, Correctional Officer James Bosas saw Locke sitting on the floor of his cell while Bosas was on duty on the third floor. DPFF, ¶¶ 75, 78. Locke told Bosas he had thrown up after Bosas asked if he was okay. *Id.* at ¶ 79. Locke did not appear ill to Bosas nor could Bosas see if Locke had vomited. *Id.* at ¶ 80. Bosas contacted medical personnel to evaluate Locke. *Id.* at ¶ 81. Locke was removed from his cell and sat in the day room while biohazard cleanup personnel tended to Locke's cell. *Id.* at ¶ 82. Once Locke was returned to his cell, medical personnel evaluated him and approved him to stay in the unit. *Id.* at ¶ 83. On this day, Bosas recalls that 3C was "feeling warm." *Id.* at ¶ 77. Locke claims that two nurses observed the conditions in his cell in addition to Bosas. PPFF, ¶ 23. The two nurses found the vents were hot enough to cause them to "snatch" their hands back and that the vent cover was "very hot to the touch," according to Locke. *Id.* The Jail's lieutenant and classification officer granted permission to move Locke to another cell as a precaution due to his report. DPFF, ¶ 85. Once placed in the new cell, Locke appeared to go to sleep; no ailment was observed. *Id.* at ¶ 86. Locke was initially

reassigned to cell 21 of Pod 3C and later moved to cell 42 in the upper tier of Pod 3C. *Id.* at ¶ 87.

Locke claims he submitted another written grievance on March 4, 2018, about the conditions in

his cell, but the Jail's records do not reflect that a second grievance was ever submitted, according

to Defendants. PPFF, ¶ 25; *see also* Dkt. No. 57 at 13.

Neumann received a telephone call about the temperature being too hot in Pod 3C's cells

on March 8, 2018, and requested that facilities recheck cell temperatures. DPFF, ¶¶ 92–93. The

same day, facilities checked the cell temperatures and observed temperatures ranging from 74 to

78 degrees; thermostats were subsequently "adjusted and calibrated." *Id.* at ¶ 94. Locke also

alleges that the heat was noticeably hot on March 13, 2018, and observed by an Officer Green.

PPFF, ¶ 30. Locke states that inmates who complained about the heat and ventilation system were

being threatened with a move to segregation for complaining. *Id.* at ¶ 31.

On March 26, 2018, Neumann received a report that Pod 3C's cells were too cold. DPFF,

¶ 95. Facilities believed that the conditions were a result of the temperature being decreased "too

far" on March 8, 2018, after the earlier complaints. *Id.* at ¶ 96. Facilities checked all reheat valves

and found that they were functioning properly and maintaining the "acceptable" temperature

range between 70 and 75 degrees. *Id.* at ¶ 97. Facilities rechecked cell temperatures on March

27, March 29, and April 17, 2018, and noted that cell temperatures were within the acceptable

range. *Id.* at ¶ 99.

On March 21, 2018, Dobson and Dittberner were provided a copy of the complaint filed

by Locke to commence this lawsuit. *Id.* at ¶¶ 10, 15. Prior to this time, Dobson and Dittberner

claim they were not aware of any heating or ventilation issues in Pod 3C. *Id.* at ¶ 15. Locke

alleges that he "continuously" complained to every staff member that worked in 3C about the

conditions, including medical personnel. PPFF, ¶¶ 9, 23, 35. On March 24, 2018, Locke was reassigned to cell 47 in Pod 5D. DPFF, ¶ 3.

On March 28, 2018, the week after Locke commenced this lawsuit, he filed a medical request form; no medical complaint or request is noted in Locke's record prior to this form. *Id.* at ¶ 100. In the medical request, Locke stated: "For the last (2) months or so I have been housed in extremely hot cells and have had nose bleeds, headaches, nausea, confusion, dizziness, ext [sic] I am still feeling dehydrated diariah [sic] stomach aches and have threw up again." *Id.* at ¶ 101. On April 20, 2018, Locke was seen for a medical sick call. *Id.* at ¶ 102. According to the medical records, Locke stated his earlier request was ignored and he had been placed in "extremely hot cells" for two months and experienced "nose bleeds, headaches, nausea, confusion, dizziness, ext [sic] I am still feeling dehydrated diariah [sic], stomach aches and have threw up again." *Id.* The record also indicates that Locke felt that his issues improved once he was moved to 5D where the ventilation was better. *Id.* The treatment provider noted that Locke was "well-nourished" and showed "no distress" and suggested he "[k]eep up on fluids, eat heathy diet" and "[c]hange positions slow if dizzy/lightheaded." *Id.* at ¶¶ 103–04. A medical request submitted by Locke on May 20, 2018, stated that he had been in a car accident in 2016, but stopped pain medication after 15 months due to side effects. *Id.* at ¶ 107. Locke stated he remains in "unbearable pain" and requested medical attention to get back pain medication. *Id.* On May 22, 2018, medical staff saw Locke and he complained about his "very warm" pod with "poor ventilation" that caused him emesis, dark urine, nose bleeds, fainting, anxiety, and headaches. *Id.* at ¶ 105. Medical staff advised him to hydrate. *Id.* Defendants state that Locke had water available to him in his cell the entire time he was in custody. *Id.* at ¶ 6.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that the is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of showing that there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted).

**ANALYSIS**

**A. Conditions of Confinement**

The Eighth Amendment prohibits "cruel and unusual punishment" of a prisoner. U.S. Const. amend. VIII. "In order to violate the Eighth Amendment, the condition of confinement must be a denial of 'basic human needs' or the 'minimal civilized measure of life's necessities.'" *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Additionally, the "infliction must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable." *Id.* (citations omitted).

Because Locke was a pretrial detainee for the periods relevant to this action, his claims arise under the Due Process Clause of the Fourteenth Amendment. *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). The Due Process Clause prohibits any kind of punishment of a pretrial detainee, not simply cruel and unusual punishment. *Antonelli*, 81 F.3d at 1427 (citations omitted). "A condition of confinement may be imposed on a pretrial detainee without violating the Due Process Clause if it is reasonably related to a legitimate and non-punitive governmental goal. It may not be arbitrary or purposeless." *Id.* (citations omitted). However, when evaluating such claims, "courts still look to Eighth Amendment case law in addressing the claims of pretrial detainees, given that the protections of the Fourteenth Amendment's due process clause are at least as broad as those that the Eighth Amendment affords to convicted prisoners." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012); *see also Salazar v. City of Chi.*, 940 F.2d 233, 239–40 (7th Cir. 1991).

Conditions of confinement in a jail or prison violate the Eighth Amendment's prohibition against cruel and unusual punishment when (1) "there is a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of "the minimal civilized measure of life's necessities,"' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it." *Rice*, 675 F.3d at 665 (citing *Farmer*, 511 U.S. at 837).

Prison conditions may be unconstitutionally unacceptable if they "pose a 'substantial risk to inmate health or safety.'" *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Farmer*, 511 U.S. 837). A lack of heat, inadequate clothing, or sanitation can constitute

such a deprivation. *Gray*, 826 F.3d at 1005 (citing *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)). At the same time, "[j]ail conditions 'may be uncomfortable, even harsh, without being inhumane.'" *Estate of Simpson*, 863 F.3d at 745 (quoting *Rice*, 675 F.3d at 664–65).

Here, Locke has not established that the temperature conditions in his cell amounted to a constitutional violation. Locke alleges that he was forced to live in extremely hot conditions where hazardous heat was pumped into his and other inmates' cells for the entire period of January 23, 2018 to March 24, 2018. Dkt. No. 48 at 3. To establish these hazardous conditions, Locke points to his own grievances and complaints to jail officials. To show the extent of the heat, he offers a single temperature reading taken by Neumann in addition to his own observations that the heat was hazardous. At one point, on or about February 21, 2018, Locke says Neumann used a thermometer to measure Locke's cell temperature at 90 degrees and recorded it as 88 degrees. PPFF, ¶¶ 13–15. This occurred after a regularly-scheduled fire alarm test where the ventilation system is temporarily shut down as a safety precaution. *Id.*; *see also* DPFF, ¶ 64. On March 8, 2018, Locke says Neumann entered his cell and observed the rear vent was "pumping out extremely hot heat" and the front vent was not functioning. PPFF, ¶¶ 38–39. In contrast, Defendants documented the pod's temperature ranging from 74 to 78 degrees on March 8, 2018, and subsequently rechecked cell temperatures on at least four other occasions where they measured temperatures between 70 and 75 degrees. DPFF, ¶¶ 94, 97–99. Defendants claim that it was impossible for cell temperatures to exceed 82 degrees given the building's engineering— even if cell vents were clogged. *Id.* at ¶ 132. They also claim that during the relevant period, January to March 2018, no inmate besides Locke filed a grievance about cells being too hot; the only temperature-related grievances that were filed complained about temperatures being too cold. *Id.* at ¶¶ 37–38.

Locke's evidence, viewed in the light most favorable to him as required on summary judgment, is insufficient for a reasonable factfinder to conclude that cell temperatures reached inhumane levels for the extended period of time that he claims. At most, his complaints support a finding of discomfort not unlike summer days without air conditioning in most parts of the country. This is hardly enough to constitute cruel and unusual punishment. *Compare Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (finding a conditions of confinement claim where cell temperatures averaged 40 degrees and ice regularly formed on cell walls during winter), *Henderson v. DeRobertis*, 940 F.2d 1055, 1057 (7th Cir. 1991) (reversing a finding of qualified immunity for prison officials where cell temperatures fell below freezing during a four-day cold spell where the outdoor windchill was recorded at 80 degrees below freezing, the cellblock's heating system malfunctioned, and broken windows allowed cold air inside), *and White v. Monoha*n, 326 F. App'x 385, 387 (7th Cir. 2009) (cell temperatures measuring 110 to 130 degrees during the summer months stated a due process claim), *with Rogers v. Scott*, 695 F. App'x 155, 159 (7th Cir. 2017) (cell temperatures measuring in the middle 70s and low 80s and peaking at 85 degrees while the air conditioning was being repaired over several weeks did not violate the Fourteenth Amendment). Locke alleges that one temperature reading reached 90 degrees, but this fails to establish that temperatures were at this level for the entire period that Locke was housed at the Jail. He otherwise relies on his own observations that hot air was continuously being pushed into his cell and his own symptoms to establish the extreme temperatures that his cell reached during the winter months of 2018. Without more, no reasonable jury would find that this evidence amounts to the kind of extreme heat conditions that violate the Constitution.

In addition to not establishing conditions severe enough to amount to cruel and unusual punishment, Locke is unable to demonstrate that Defendants were deliberately indifferent to these

9

conditions in a manner to violate the Due Process clause. Officials are deliberately indifferent when they "knew that [the prisoner] faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). Here, Locke's own version of events acknowledges the reasonable steps that Defendants took to address his complaints. Locke admits that Neumann placed a work order with facilities after Locke made his complaint about the heat in his cell during the fire alarm test on February 21, 2018. Dkt. No. 49 at 17. Locke submitted as an exhibit a copy of the work order placed with facilities on this date. Dkt. No. 51-1 at 60. On March 21, 2018, Locke states that Neuman, Turner, and HVAC went through the 3C housing unit to inspect the ventilation system. PPFF, ¶ 41. On March 22, 2018, Locke says that Neuman, maintenance, HVAC, and facility staff cleaned and unclogged the intake vents in the cells. *Id.* at ¶ 46. Locke also filed exhibits detailing email correspondence showing Defendants discussing cell temperatures and a plan for facilities to check the vents. Dkt. No. 51-1 at 38. On another day, temperatures were too cold in certain cells (averaging 59.4 degrees) and Neumann emailed Dittberner to relay that he contacted facilities for "immediate correction;" the next day the same cells were rechecked and temperatures were 73 to 75 degrees. *Id.* at 42–43. Locke cannot establish deliberate indifference based on these facts. His version of events does not show that Defendants ignored his complaints. Instead, Defendants investigated the cell temperatures, contacted those responsible for heating the facilities, and followed-up after adjustments were made. This does not amount to deliberate indifference. Because Locke has not established that cell conditions were extreme or that Defendants acted with deliberate indifference, summary judgment will be granted for Defendants.

Lastly, Locke has not shown that Milwaukee County had a policy or custom to maintain hazardous heat and ventilation conditions in the Jail. Claims that a governmental unit or

municipality is liable for constitutional violations are governed by the principles of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and must show that its policy, practice, or custom caused the constitutional violation. *See Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). This requires evidence of: "1) an express municipal policy, 2) a widespread practice constituting a custom or usage; or 3) a constitutional injury caused by or ratified by a person with final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (quoting *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002)).

Locke argues that the Jail's staff and administration failed to remedy the hazardous heat and ventilation conditions since at least 2017 and, per an unwritten policy, have violated the Constitution. Dkt. No. 48 at 9. He also alleges that the Sherriff's office was made aware of these hazardous conditions since 2017 or earlier. PPFF, ¶ 56. Locke points to evidence he found about the conditions before he arrived at the Jail. He includes an email to Turner from April 2017 where an Officer requests maintenance because "Cell 9 has high temperatures" and he "had a couple medical emergencies due to the heat." Dkt. No. 51-1 at 13. Locke also includes various work orders placed in 2017 addressing cell temperature conditions. *See Id.* at 8 ("3c 26 blowing only hot air"); at 9 ("average temp pumping out of vents was 83 degrees one at 85"); at 16 ("3C hot air blowing in top tier cells"); at 20 ("Due to low temperatures in dayroom area steam from showers is setting building into full fire alarm."); and at 21 ("Officer describes cells to the right of the desk are hot"). This evidence, however, does not show a widespread practice of ignoring inhumane conditions and does not demonstrate an unwritten policy. If anything, it indicates that the HVAC facilities at the Milwaukee County Jail may not be modern and perfectly efficient, and that the Jail's officials were observing cell conditions or responding to complaints before Locke

11

arrived at the Jail. Without more, Locke has failed to show that Milwaukee County caused a constitutional violation and summary judgment will be granted in favor of the county.

## B. Qualified Immunity

Defendants argue that the doctrine of qualified immunity establishes a separate basis for granting summary judgment. Government officials are protected from liability for civil damages under the doctrine of qualified immunity insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A right is "clearly established" if it has a "sufficiently clear foundation in then-existing precedent," meaning it is "settled law" as "dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority."'" *Id.* at 589–90 (first quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam); then quoting *Aschroft v. al–Kidd*, 563 U.S. 731, 741–42 (2011)). Under this demanding standard, qualified immunity extends to "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). "Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

Locke has not met his burden to defeat Defendants' claim of qualified immunity. He has not established a violation of his constitutional rights. Locke must meet both prongs noted in *Wesby* to show that Defendants are not entitled to qualified immunity—it is a two-part test. *See*

*also Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). As Locke has not established that the conditions of his confinement violated the Constitution, he cannot show that Defendants were acting without qualified immunity.

**C.  Defendants' Motion to File Restricted Materials Under Seal**

Finally, Defendants have moved to restrict certain documents only to case participants pursuant to Gen. L. R. 79(d). Dkt. No. 28. As Defendants are in possession of Locke's medical records, they wish to file portions of certain documents that incorporate these records under restricted view and separately file redacted versions of these materials.

Defendants' motion will be granted. They have explained that documents they have filed reflect Locke's personally identifiable health information. The exhibits filed include Locke's intake screening forms and medical exams. Dkt. No. 32-3. Accordingly, the court finds good cause to grant Defendants' motion, Dkt. No. 28, to the extent they have already filed documents under seal as contemplated therein.

## CONCLUSION

For the foregoing reasons, Defendants' motion to restrict certain documents (Dkt. No. 28) and motion for summary judgment (Dkt. No. 30) are **GRANTED**. This case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 10th day of March, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court

13